# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

BARBARA MAY,

                    **Plaintiff,**

-vs-                                        **Case No.  6:04-cv-1704-Orl-JGG**

COMMISSIONER OF SOCIAL
SECURITY,

                    **Defendant.**
_____

# MEMORANDUM OF DECISION

Plaintiff Barbara May ["May"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying May's application for benefits.  *See* Docket No. 1 (complaint).   For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On March 26, 1998, May protectively filed applications for Supplemental Security Income, a Period of Disability and Disability Insurance Benefits.  R. 113 – 16, 267 - 69.  These applications were denied initially and upon reconsideration.  R. 92 – 99, 270 – 78.  A request for hearing was made on October 7, 1998.  R. 100.  On December 17, 1998, this matter came on for a hearing before the Honorable James R. Ciaravino, Administrative Law Judge ("ALJ Ciaravino").  R. 31 – 88.

On April 14, 1999, Judge Ciaravino rendered an unfavorable decision, and found that May was not disabled.  R. 11 – 28.  On May 21, 1999, May requested that the Appeals Council ("AC") review ALJ Ciaravino's decision.  R. 8 – 10.  May submitted to the AC the following information: Letter

from the Department of Highway Safety and Motor Vehicles dated August 10, 1999; test results from

Thomas Y. Kim, M.D. dated June 13, 1999; and treatment records from Chiropractic One, dated

November 4, 1996 to January 19, 1998.  R. 279 – 308.  The AC, on May 16, 2000, concluded that

there was no basis to overturn the ALJ Ciaravino's decision.  R. 5 – 6.

On May 3, 2000, May filed her first complaint with the United States District Court regarding

the Commissioner's decision.  On August 27, 2001, the Honorable Judge James G. Glazebrook

reversed the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  R. 462-63.

On remand, the Court directed the ALJ to:

> [C]onsider the opinions and medical source statements from Drs.
> Robert Barrett and Thomas Kim in accordance with 20 C.F.R. §§
> 404.1527, 416.927 and explain the weight given to such opinion
> evidence.  In addition, the ALJ will evaluate Plaintiff's subjective
> complaints and provide rationale in accordance with the disability
> regulations pertaining to the evaluation of symptoms, pertinent case
> law and SSR 96-7p.
>
> The ALJ will consider the evaluation of examining neurologist,
> Dr. Michael F. Brown.  The ALJ will also consider Plaintiff's
> maximum Residual Functional Capacity with appropriate rationale and
> specific references to the evidence of record in support of the assessed
> limitations.  Furthermore, the ALJ will obtain testimony from a
> vocational expert (VE) to clarify the effect of the assessed limitations
> on Plaintiff's occupational base.  The hypothetical questioned posed to
> the VE should include Plaintiff's documented exertional and
> non-exertional restrictions.

R. 462 – 63.

The AC remanded the case to the ALJ on October 11, 2001.  R. 466 – 67.  On February 26,

2002, ALJ Ciaravino held a supplemental hearing.  R. 328 – 76.  On April 16, 2002, ALJ Ciaravino

issued a second decision finding May was not disabled.  R. 312 – 25.

May filed her second complaint with the United States District Court seeking review of the Commissioner's decision. On September 10, 2003, Magistrate Judge Karla R. Spaulding reversed the Commissioner's decision, finding that it was unsupported by substantial evidence and remanding it for further proceedings. R. 575 - 85. On remand, the ALJ was to assess May's functional limitations arising from her nonexertional impairments (dizziness/panic attacks/lightheadedness), and to pose a hypothetical question to the VE that includes May's nonexertional limitations. R. 584.

The AC remanded the case for further proceedings on November 10, 2003. R. 586 - 87. On May 19, 2004, ALJ Henry Snavely held a third hearing. R. 648 - 82. On September 20, 2004, ALJ Snavely issued a decision finding Plaintiff not disabled. R. 562 - 68.

On November 11, 2004, May filed a third complaint with the United States District Court challenging the Commissioner's decision. It is this complaint that is currently pending before the Court. Both sides have briefed the issues and the matter is ripe for determination.

## II.   THE PARTIES' POSITIONS

May contends the Commissioner's decision was not based on substantial evidence. Specifically, May argues that: 1.) the ALJ failed to appropriately evaluate May's complaints of pain (Docket 20 at 13); 2.) the ALJ failed to articulate specific and adequate reasons for rejecting May's testimony regarding her limitations arising from her headaches, dizziness and pain (Docket 20 at 15); and 3.) the hypothetical questions posed to the VE failed to appropriately take into account May's nonexertional impairments (Docket 20 at 15-16). The Commissioner argues that the decision is supported by substantial evidence.

III.     **THE STANDARD OF REVIEW**

   A.     **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

   B.     **REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon*

-6-

*v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also, Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security

---

[1] The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

## B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520 (b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520 ©). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520 (d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520 (e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work) prevent him

from doing other work that exists in the national economy, then claimant is disabled.   20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423 (d)(2)(B).   The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.   *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).   Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.   *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.   A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.   *Vega v. Comm'r,* 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.   *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).   If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.   *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).   In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].   This assessment measures whether a claimant can perform past relevant work despite his or her impairment.   20 C.F.R. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).   The ALJ makes this

determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), ©).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201

(11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).  Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a

wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Comm'r of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527 (e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

-13-

### E.    PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; *Walker*, 826 F.2d at 1003.

Congress has determined that a claimant will not be considered disabled unless he furnishes medical

and other evidence (*e.g.*, medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C.

§ 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including

pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with

the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and

laboratory findings show medical impairments which reasonably could be expected to produce the

pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either
> (2) objective medical evidence that confirms the severity of the alleged pain arising
> from that condition or (3) that the objectively determined medical condition is of such
> a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone

can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*,

957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself,

conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir.

1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb

-14-

a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (failure to order such an evaluation may be

-15-

reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

V. **APPLICATION AND ANALYSIS**

A. **THE FACTS**

May was born on December 3, 1965, and was 38 years old at the time of the third hearing held on May 19, 2004. R. 648, 654. May has a tenth grade education and past relevant experience as a custodian, forklift operator in a plant-nursery, and housekeeper. R. 655. May testified that she has not worked since June 1996, and that she stopped working because of her vasovagal syncope, low back pain, and migraines. R. 655-56.

On January 12, 1993, May's employer referred her to Emmanuel D. Scarlatos, M.D., due to a back injury suffered at work. R. 164. May's chief complaint was discomfort in the left lumbar paravertebral musculature. *Id*. She had no discomfort or radiculitis of the lower extremities. *Id*. She was minimally tender to palpation in the iliolumbar area. *Id*. X-rays of the lumbar spine were normal with the exception of six lumbar vertebrae and some mild posterior facet arthrosis at L5-S1. R. 165. She was diagnosed with acute lumbar myofascial strain and mild posterior facet arthrosis, L5-S1. *Id*. She was given a lumbosacral support and was instructed to remain off work for five days. *Id*.

May saw orthopaedic surgeon Stephen R. Goll on April 8, 1993. R. 166. Dr. Goll was perplexed by May's lack of progress. *Id*.[2] Although May reported persistent lumbar pain and exhibited diffuse tenderness, Dr. Goll found no objective reason for it. *Id*. Dr. Goll assigned May a 3.5% permanent partial impairment for workers' compensation purposes, and discharged May from

---

[2] This medical record is obviously incomplete, being page 7 of an unknown number of pages.

his care as she was not a surgical candidate. *Id*. Dr. Goll left May on light duty restrictions for the present time, and further treatment was to be directed by her rehabilitative medicine specialist. *Id*.

May was next evaluated by Matthew Imfeld, M.D. on June 21, 1994. R. 171. Dr. Imfeld could find no clinical evidence to suspect cervical or lumbosacral radiculopathy. *Id*. He also did not believe there was anything he could offer May from a physical medicine or rehabilitative standpoint. *Id*. Dr. Imfeld did not believe May had any permanent partial impairment based on the Minnesota guidelines. *Id*.

On January 5, 1994, David D. Molhem, D.C., noted that May's condition did not improve with chiropractic treatment and physical therapy treatment and was released from his care. R. 167. Dr. Molhem placed May on "permanent" restrictions of no lifting over 25 pounds, only walking a quarter of a mile per day and bending limited to six times per day "until someone can find out what is wrong with this patient and correct the condition." *Id*. Dr. Molheim noted that May has "left sided spinal pathology of some sort," along with limited right lateral flexion of the thoracolumbar spine with pain on the left side. *Id*. This was objectively verified by large abnormal muscle mass on the left side of the lumbar spine that was very palpable. *Id*. Dr. Molhem further noted that in his ten years of experience in treating similar cases, virtually all of the other patients obtained complete relief with the type of treatment provided to May. *Id.*

Joseph Flynn, Jr., M.D. was the next doctor to treat May beginning May 11, 1994. R. 171. Dr. Flynn treated May's complaints of lower back pain with anti-inflammatory medications. *Id*. An MRI of the lower back was taken, which proved negative. *Id*. Dr. Flynn could find no pathology to explain May's reported pain, and gave a final diagnosis of Lumbar Strain with continued reports of

pain. *Id*. Dr. Flynn believed May could return to work with no restrictions and had no permanent partial impairment rating. *Id.*

On October 6, 1994, Plaintiff was evaluated by Board certified psychiatrist E. Michael Gutman to determine her mental condition, diagnosis, prognosis, recommendations for treatment and other matters dealing with her work-related accident. R. 170. May's functional history showed that her day began at 7:00 a.m. and ended between 9:00 p.m. to 11:00 p.m. R. 172. May stated she did her own housework and cooking, reads the newspaper, and handles the family finances through cash transactions. *Id*. She administered and managed her own medications. *Id*. She had a driver's license and a car. *Id*. She was adequately, but not crisply groomed. *Id*. Her speech was vague at times, though her thought process was logical and coherent. *Id*. Her thought content showed no evidence of psychotic symptoms with no delusions, hallucinations, ideas of reference or tangential thinking. *Id*. She was preoccupied with physical complaints, and showed evidence of exaggeration, over-magnification and functional overlay. *Id*. She showed some passive-aggressive personality traits. Her concentration was adequate, her insights were superficial to nil and her judgment was intact. *Id*. She appeared to be of average intelligence. *Id*.

Dr. Gutman administered the Minnesota Multiphasic Personality Inventory ("MMPI") test, in which Plaintiff attempted to present herself in the best possible light with regard to moral values and self control. R. 173. No clinical scales were found to be in the clinical range, indicating no evidence of a severe psychopathology or character disturbance. *Id*. Underlying anger and depression was likely. *Id*. Plaintiff may feel uncomfortable in unfamiliar social settings. *Id*. Dr. Gutman's multiaxial diagnostic opinion was: Axis I (Clinical Disorder) Somatoform disorder – pain disorder

-18-

associated with psychological and physical factors (underlying depression, functional overlay, and low back condition) – 307.89; Axis II (Personality Disorder), no diagnosis; Axis III (Physical Illness), lumbrosacral strain and thoracicolumbar myofascial fibrositis per medical records; Axis IV (Psychological Stressors), severity 3 – moderate chronic pain complaints, unemployment, financial stress; Axis V (GAF), 66.  R. 173.  Dr. Gutman did not believe May needed psychiatric treatment. R. 174.

On June 23, 1996, May presented to the emergency room at Orlando Regional Medical Center due to passing out while picking at a toenail.  She was sitting down and then proceeded to pass out. A few hours later, while dining out, she again felt lightheaded and then presented herself to the emergency room.  May was diagnosed with probable autonomic dysfunction – vasovagal syncope. R. 176.

May followed up the next day with her doctor, Cheryl Oh, M.D.  R. 210.  Dr. Oh's examination revealed no objective cause for the syncope, and she planned to do a workup for event monitoring and a tilt table test.  Dr. Oh instructed May not to lock her bathroom door, never skip meals, to avoid glucose or sweet foods, and to drink liberal amounts of water.  *Id*.

Plaintiff saw Patrick F. Mathias, M.D.[3] on July 1, 1996, due to her episode of syncope.  R. 233-34.  May denied seizures or focal neurological signs.  She denied chest pain, shortness of breath, paroxysmal nocturnal dyspnea, and orthopnea.  The impression was no clinical evidence of cardiac pathology but recurrent syncope, which occurs on a sitting position.  The condition was probably related to recurrent neurodepressive syncope.  Dr. Mathias scheduled May for an echo to evaluate for

---

[3] Dr. Mathias has a group cardiology practice with Johnson Massey, M.D., Robert Barrett, M.D. and Thomas Kim, M.D., each of whom treated May at some point in time.

structural heart disease and a tilt table test.  She was also to be given a Holter monitor to make sure she has mean malignant arrhythmia.  R. 233 – 34.  The tilt table test was performed on July 8, 1996, and the results were positive.  R. 231.  Plaintiff was started on Lopressor and Theo-Dur, and was to be evaluated in two weeks.  *Id*. The Holter Monitor Report did not reveal any significant bradyarrhythmias.  R. 230.  There were rare atrial premature beats, without runs of ventricular tachycardia.  *Id*.

May returned to Dr. Oh's office on July 11, 1996, with complaints of lower mid chest pain with nausea and no appetite for several days.  R. 209.  The impression was most possibly gastritis versus ulcers.  *Id*.  She was prescribed Zantac. *Id*.  Dr. Oh also noted that May did not tolerate metoprolol or Theo-Dur, and was currently on hold for those medications.  *Id*.  On July 25, 1996, May saw Dr. Oh with complaints of headaches which start at the base of the left jaw and radiate to the temporal and retrobular area, pulsating in nature.  R. 206.  No photophobia or sensitivity to voices.  Neuro exam was within normal limits.  She was diagnosed with vascular headaches, gastritis and syncope.  *Id*.

Robert L. Barrett, M.D. saw May on August 8, 1996.  R. 228.  May reported feeling better since starting Florinef.  *Id*.  Barrett also prescribed Inderal.  *Id*.  Impression was neurodepressive or vasovagal syncope.  *Id*.  May was to return in two months to make sure her symptoms were completely controlled.  *Id*.  R. 228.  On October 18, 1996, Dr. Barrett stated that, due to Plaintiff's severe vasovagal syncope, she "will not be able to maintain a job that requires heavy physical exertion or having to stand for long periods of time."  R. 227.  On November 13, 1996, May reported to Dr. Barrett with occasional episodes of lightheadedness. R. 226.  Her dosage of Inderal was doubled

and she was to return in three months. *Id*. If the episodes of dizziness continued, she was instructed to return immediately. *Id*.

On January 21, 1997, May saw Dr. Barrett. R. 225. Dr. Barrett stated that May was doing well overall and had no actual syncopal spells, but noted that she has occasional lightheadedness and weakness. *Id*. Dr. Barrett believed May's symptoms were fairly well controlled and scheduled her to follow up in five months. *Id*.

May saw Dr. Massey on March 3, 1997, after a dizzy episode over the weekend. R. 224. At the time of the exam, she denied any dizziness and Dr. Massey concluded that her neurodepressive syncope was asymptomatic. *Id*. Because May expressed an interest in driving a car, Dr. Massey agreed to repeat the tilt table test. *Id*. The results of the tilt table test were negative, suggesting that May was being treated adequately with her current medications. R. 223.

Plaintiff presented to Centra Care on May 24, 1997, with complaints of stomach pain after eating fajitas, and weakness and tiredness. R. 199.

Dr. Barrett saw May on June 10, 1997. R. 222. Dr. Barrett again confirmed that May was doing fairly well with no actual syncopal spells, but that she was still getting lightheaded frequently. *Id*. Dr. Barrett recommended that May use salt over the summer. *Id*. She was to return in five months. *Id*.

On August 6, 1997, Dr. Massey saw May and noted that she was stable with medication and had no new complaints. R. 221. She was to return in six months. *Id*.

On October 3, 1997, Dr. Oh treated May for a sore throat and dry cough. R. 499. Dr. Oh's impression was bronchitis, laryngitis and migraine headaches. R. 499.

Dr. Oh saw May on November 7, 1997, for back pain, left forearm pain and shoulder pain. R. 203.  She had a tender left sacroiliac junction, right upper trapezius muscle spasm and tender at the left elbow lateral epicondyle.  *Id*.  Dr. Oh prescribed medication and an exercise regimen.  *Id*.

Thomas Y. Kim, M.D. saw May on December 9, 1997, for a follow up visit.  May had no episodes of syncope since her last visit and had no new complaints.  R. 220.  Dr. Kim determined that no further cardiology work up was needed and May could follow up every year or so, or sooner should she have any recurrent episodes of syncope.  *Id*.

On February 9, 1998, May saw Dr. Oh for a recurrent episode of severe dizziness when she was lying in bed.  R. 202.  There was no loss of consciousness and no change of positioning.  *Id*.  May was referred to her cardiologist.  *Id*.

On February 11, 1998, May saw Dr. Kim due to her episode of near syncope.  R. 218.  May stated she was having headaches, was feeling very nervous, tearful and dizzy.  *Id*.  Dr. Kim noted that although Plaintiff had no frank syncope on Florinef and Inderal, she had episodes of near syncope.  *Id*.  Dr. Kim stated it was possible that May's recent episodes of lightheadedness were due to hyperventilation and anxiety.  R. 219.  He, therefore, prescribed Prozac and instructed May to return in two months.  *Id*.

Plaintiff returned to Dr. Oh on May 5, 1998, for migraines.  R. 200.  May reported that she was experiencing backaches that affected her left shoulder and left side of her back, which aggravated and triggered the migraines.  *Id*.  May's neurological exam was normal.  *Id*.  Dr. Oh prescribed Flexeril, Imitrex and a back exercise regimen.  *Id*.

On May 27, 1998, May had a follow up visit with Dr. Kim.  R. 216.  May stated she has had no episodes of syncope or near syncope since her last visit.  *Id.*  May reported, however, that she was experiencing dizziness that would last for as long as a week.  *Id.*  She also reported her symptoms were somewhat better on the Prozac.  *Id.*  May denies any significant stressors, and Dr. Kim concluded that her episodes of continued mild dizziness do not sound like vasodepressor or neurocardiogenic phenomena.  *Id.*  If they continued, a referral to a neurologist may be appropriate.  *Id.*  Dr. Kim continued May on her present medications and recommended a follow-up visit in a year or so.  R. 217.

May was evaluated on August 31, 1998, by Karen R. Wagner, B.A. (psychometrist) and Cydney Yerushalmi, Ed.D.  (psychologist).  R. 238 - 40.[4]  The claimant told the evaluators that she drives, but that she always has someone with her "just in case."  She arises at nine or ten in the morning and stays home and "takes it easy."  She shops only in the company of her husband or father-in-law, and she relies on her fourteen year old stepdaughter to cook, clean and launder.  The evaluators noted that May was well-oriented to time, but denied knowing which city she was in, although she had an appointment letter with the office's address in her possession. May also scored a standard score of 94 on the Wide Range Achievement test with a grade equivalent of high school.

May was diagnosed with a somatoform disorder.  The evaluators noted that Ms. May had been complaining of number of symptoms for four years which no medical testing could collaborate.  The evaluators opined that May's life was well-arranged for her illnesses, and that she had no incentive to get better as her family took care of all chores while she rests. The evaluators concluded that May would benefit from the services of Vocational Rehabilitation.  R. 239 – 40.

---

[4]Judge Ciaravino referred to both evaluators as "Dr. Yerushalmi" in his decision.  See R. 19.

On September 17, 1998, Jeffrey L. Prickett, Psy.D., a non-examining state physician, conducted a Mental Residual Functional Capacity Assessment. R. 241- 54. Dr. Prickett determined that May was moderately limited in her ability to maintain attention and concentration for extended periods and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 241 – 242. In all other areas, May had no significant limitations. *Id*. Dr. Prickett concluded that May was able to carry out instructions, that she could make simple decisions, perform routine task, and can concentrate on simple tasks. R. 243. Further, May's social and adaptive functions appear adequate. *Id*.

On November 12, 1998, Dr. Oh saw May for back pain. R. 262. She had tenderness of the left sacroiliac junction. *Id*. The assessment was recurrent backache and occasional recurrent dizzy spells. *Id*. Dr. Oh prescribed Ibuprofen and Flexeril and cautioned May to maintain good posture. *Id*. She was to return as needed. *Id*.

May returned to Dr. Kim on November 18, 1998, with recurrent episodes of dizziness, often associated with shaking and anxiety. R. 260. May's symptoms were distinct from the syncopal-like episodes that May previously experienced, and Dr. Kim suspected May was suffering from panic attacks associated with hyperventilation. *Id*. A referral to a neurologist or psychiatrist may be considered in the future. *Id.*

Dr. Oh saw May on January 12, 1999. R. 505. Dr. Oh noted that since Imitrex failed to treat May's migraine headaches, Fiorinal would be tried. *Id*.

-24-

On January 29, 1999, Plaintiff saw Michael F. Brown, M.D. for a neurological evaluation.  R. 264.  May complained of recurrent headaches that were left frontotemporal in distribution and throbbing in character.  *Id*.  There was associated nausea, vomiting, photophobia and phonophobia. *Id*.  The headaches occurred once or twice a month on average.  *Id*.  The assessment was vascular headache disorder (migraine without aura).  *Id*.  She was given a trial of Zomig and was instructed to follow up in three months or as needed.  R. 265.

May was seen by Sara Fischer, P.A. with Dr. Oh's office on March 5, 1999, for a one-week history of intermittent diarrhea, abdominal cramping and nausea without vomiting.  R. 506.  May also reported rectal bleeding and mucus in the stool.  *Id*.  May was assessed with abdominal pain and rectal bleeding and was referred to the emergency room.  *Id*.

May had a follow up visit with Dr. Kim on May 18, 1999, at which time she reported  episodes of lightheadedness and dizziness that occur about once or twice a week.  R. 539.  Dr. Kim noted that May's neurologist does not believe these episodes are neurologic in etiology.  *Id.*  Dr. Kim's impression was there may be an element of anxiety and hyperventilation causing these episodes.  *Id*. As to neurocardiogenic syncope, May has had no syncopal-like symptoms while on her medication. R. 540.  Dr. Kim's plan was to have another tilt table test and to continue her current medications. *Id*.

On July 11, 1999, May underwent a table tilt test which was negative, with no inducible neurocardiogenic syncope.  R. 281.  Dr. Kim believed it was highly unlikely that May's dizziness was due to neurocardiogenic reflex that caused her first episode of syncope.  *Id*.  The Florinef, however, appears to have caused hypertension, so he recommended discontinuation of that drug.  *Id*.

On July 27, 1999, Dr. Kim noted May's history of neurocardiogenic / vasovagal syncope, with recurrent episodes of dizziness and lightheadedness.  R. 542.  He further noted that she was relatively asymptomatic on her current medications.  *Id*.

On October 22, 1999, Dr. Oh saw May for a follow-up visit.  R. 507.  Her diagnosis included: GERD [gastroesophageal reflux disease], currently controlled; migraine headaches, much improved; history of neurogenic syncope, much improved without any significant recurrences; and chronic back ache, which was being treated with Ibuprofen and Flexeril.  *Id*.

May followed up with Dr. Brown on December 2, 1999, with complaints of headaches one to three times per month, usually just prior to or during menses.  R. 558.  Zomig remains effective treatment, as does Excedrin at times.  *Id*.  May's assessment continued to be migraine without aura. *Id*.

May followed up with Dr. Kim on March 17, 2000. R. 544.  May continues to report episodes of lightheadedness and dizziness, which Dr. Kim is not convinced are secondary to neurocardiogenic syncope.  *Id*.  If the dizziness continues, he may consider adding a third medication, but would do so only if May's symptoms truly get worse or there is an abnormal tilt table test.  R. 544 – 45.

May saw Dr. Kim on September 1, 2000, for feelings of nervousness. R. 546.  May feels anxious and dizzy during these episodes.  *Id*.  The impression was extremely rare episodes of mild near-syncope and other more frequent episodes of dizziness, accompanied by anxiety.  *Id*.  Dr. Kim opined that May's symptoms "sound[] more like just plain anxiety disorder rather than true vasovagal syncope or near syncope."  *Id*.  Dr. Kim changed May from Prozac to Paxil.  *Id*.

On August 29, 2000, May followed up with Dr. Brown. R. 559. Dr. Brown noted that May's headache frequency had not changed, and that Zomig remained effective but was not covered by her insurance. *Id*. He therefore substituted Imitrex for the Zomig. *Id*. At a follow-up visit on March 6, 2001, Dr. Brown noted that May continues to have 2-4 headaches per month and that she is responsive to Zomig or Imitrex. R. 560. Because May's insurance no longer covered Imitrex, she was changed to Maxalt. *Id*.

On March 27, 2001, Plaintiff was seen at Florida Physicians Medical Group for refill on her medications. R. 509. She was assessed as having chronic back pain, GERD and high cholesterol. *Id.* She was prescribed Ibuprofen, Flexeril, and Prevacid. *Id.* On May 14, 2001, May had a follow-up visit. R. 510. Her cholesterol was 170/32 and she was assessed as having hyperlipidemia. She was given a dietary and exercise plan. *Id*. At May's follow-up visit on August 20, 2001, May reported that her back pain was controlled with medication and that she was doing well on reflux. R. 511. Her cholesterol count was 221/33/126/310, and she was prescribed Lipitor. *Id*. Her other medications were also continued. *Id*.

Dr. Kim noted on June 12, 2001, that May Plaintiff had infrequent episodes of lightheadedness and no syncopal episodes for a very long time. R. 548. Dr. Kim stated that the anxiety disorder was under good control with Paxil. *Id*. He noted May's reported hyperlipidemia, and encouraged May to watch her diet. *Id*. Dr. Kim continued May on her current medications. *Id.*

Dr. Oh wrote a "to whom it may concern" letter on December 6, 2001, stating that May has suffered from Neurogenic Depressive Syncope over the past few years, which causes her to have intermittent and unexpected feelings of passing out. R. 513. Dr. Oh referred any inquiries about this

condition to Dr. Kim. *Id*. Dr. Mathias also wrote a "to whom it may concern" letter on December 6, 2001, stating that May "has fairly severe syncope and is considered disabled. She cannot work at this time and requires food stamps." R. 549.

On February 6, 2002, May was seen at Florida Physicians Medical Group. She complained of coughing, lack of sleep, migraine headaches and vomiting secondary to nausea. She was diagnosed with an upper respiratory infection (URI) and migraine headaches. R. 515.

In another "to whom it may concern letter" dated February 18, 2002, Dr. Mathias repeated his statements that May "has fairly severe syncope and is considered disabled. She cannot work at this time and requires food stamps." R. 561. Dr. Mathias further stated that May will be unable to work for at least six months. *Id*.

On August 7, 2002, Francis W. Brooks, D.O. examined May. R. 643-47. May stated she was in a motor vehicle accident on July 23, 2002, and complained of neck and mid and low back pain. R. 643. Examination of the neck revealed evidence of muscle rigidity. R. 645. Examination of the back revealed palpable bilateral paravertebral muscle rigidity limiting mobility with decreased range of motion in all planes. *Id*. The assessment was occipital neuralgia, cervical strain, thoracic strain and left posterior insominate somatic dysfunction. R. 646. Dr. Brooks prescribed Ibuprofen and Flexeril, and physical therapy and he ordered x-rays. R. 647.

On August 26, 2002, May returned to Dr. Brooks with persistent neck pain radiating into the shoulders and elbows and low back pain. R. 642. X-rays of the cervical, thoracic and lumbar spine failed to reveal any fractures or dislocations. *Id*. May rated her pain as 8 on a scale from 0-10. *Id*.

Dr. Brooks continued May on Ibuprofen and Flexeril, and planned to consult with Dr. Meier for chiropractic care.  *Id.*

On September 23, 2002, May again saw Dr. Brooks.  R. 641.  May complained of persistent severe headaches beginning at the base of her skull and radiating to the top of her head, as well as neck, shoulder and back pain stiffness.  *Id.*  She received trigger point injections, which she tolerated well.  *Id*.

On October 21, 2002, May followed up with Dr. Brooks.  R. 640.  She presented with persistent myospasms of the cervicothoracic spine with tenderness in the bilateral trapezius muscles as well as tenderness of the thoracodorsal spine.  *Id.*  Dr. Brooks continued May on her medications, gave her samples of Celebrex, and continued her physical therapy and chiropractic care.  *Id.*

On January 27, 2003, May returned to Dr. Brooks for a disability evaluation.  R. 627-32.  At the time of the examination, she continued to have persistent neck, mid and low back pain and pain radiating to her left upper extremity.   May was diagnosed with cervicothoracic and lumbar strain/sprain.  R. 631.  Using the AMA Guides to the Evaluation of Permanent Impairment (5th Ed.), Dr. Brooks rated May as having a cervical spine impairment of 5%, and a lumbrosacral spine impairment of 5%, for a combined whole person impairment rating of 10%.  R. 631.  Dr. Brooks stated that May's degree of incapacitation was well stabilized, and recommended ongoing medical care consisting of short courses of physical therapy and medication management.  R. 632.

On May 5, 2004, May saw Michael MacMillan, M.D. of Jewett Orthopaedic Clinic for her low back pain.  R. 620.  May reported pain central in the low back, which did not radiate down the legs but was aggravated by standing sitting, or bending.  *Id.*  There was no numbness or weakness.  *Id.*

Diagnostic studies showed some facet tropism at L5-S1 with a deeply inset L5 vertebra. *Id*. The lateral view showed no spondylo- or retrolisthesis. *Id*. The impression was primarily discogenic disease. *Id.* An MRI was planned. *Id*.

### B.   THE ANALYSIS

#### 1.   The ALJ Appropriately Considered Plaintiff's Pain

Plaintiff argues the ALJ failed to apply the Eleventh Circuit's three-part pain standard. The three-part pain standard requires: "(1) evidence of an underlying medical condition and either; (2) objective medical evidence that confirms the severity of the pain arising from that condition; or (3) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain." *Foote*, 67 F.3d at 1560. Defendant responds by pointing out that Judge Snavely incorporated by reference the prior decision of Judge Ciaravino at R. 312-25, which addresses Plaintiff's pain allegations. See R. 566.

Judge Ciaravino found Plaintiff's allegations of pain not fully credible. R. 320. Judge Ciaravino found that Plaintiff's complaints of pain were sporadic, and that there was a lack of objective findings to support Plaintiff's pain allegations. R. 321. Finally, Judge Ciaravino found that Plaintiff's pain allegations were inconsistent with the objective medical evidence. R. 323. Judge Ciaravino adequately addressed Plaintiff's pain allegations. Further, there was no need for Judge Snavely to expand further upon these particular allegations given the limited scope of the remand order. R. 584.[5]

---

[5] In addition to incorporating by reference the prior decision of Judge Ciaravino, Judge Snavely's decision may be interpreted as addressing Plaintiff's pain allegations when he finds that the medical evidence does not support a finding that Plaintiff is totally disabled due to a "physical ailments." R. 566. *See also*, R. 567, Finding 3 ("The claimant's testimony as to significant pain, discomfort and functional limitations is not consistent with the minimal clinical findings of record. . . .")

**2.     The ALJ Sufficiently Articulated His Reasons for Rejecting May's Testimony**

Plaintiff's second challenge is that the ALJ failed to articulate specific and adequate reasons for rejecting May's testimony regarding her limitations arising from her headaches and dizziness. The ALJ found Plaintiff's testimony was not persuasive with regard to a totally disabling condition. R. 566. The ALJ's finding was based on the objective medical evidence, which was substantial, that Plaintiff's ailments do not significantly compromise her ability to do light or sedentary work. R. 566. The ALJ's finding that Plaintiff's complaints were unsupported by objective medical evidence is itself the articulation of a specific and adequate reason for rejecting Plaintiff's testimony.

**3.     The ALJ Did Not Err in Formulating the Hypothetical Questions**

Plaintiff's last argument is that the hypothetical questions posed to the VE failed to appropriately take into account May's nonexertional impairments. Plaintiff first argues that the ALJ's hypothetical question failed to recognize that Plaintiff's condition is initiated by performing "strenuous work, which may include jobs identified by the VE." Docket 20 at 16. This argument is without merit.

The ALJ asked the VE what kind of work Plaintiff could perform if she was "limited to lifting and carrying no more than 20 pounds on an occasional basis and 10 pounds on a frequent basis, walking and standing no more than two hours in an eight hour work day and sitting six hours in an eight hour work day with bending, stooping and other positional changes occurring only occasionally." R. 669-70. The VE responded that Plaintiff could perform sedentary work. R. 670. The ALJ then built upon the prior hypothetical and asked the VE "if she [Plaintiff] were precluded from exposure to heat and temperature extremes, if she were precluded from being in close spaces, *and if the work*

*were limited to sedentary activity* . . . would there be sedentary work activity which she could perform[?]"  R. 670-71 (emphasis added).  By limiting the hypothetical to "sedentary work" – with all of the exertional restrictions that term implies – the VE's opinion did not include any strenuous work.

Plaintiff next argues that the ALJ failed to include the findings of Dr. Kim and Dr. Brown in framing the hypothetical question to the VE.  Specifically, Plaintiff complains that the ALJ failed to consider that Plaintiff felt "nervous frequently, approximately 3-4 times a week."  Dr. Kim's medical records, however, reflect that the frequency of Plaintiff's nervousness was based on Plaintiff's subjective report of her condition.  R. 546.  Dr. Brown's records reflect that May reported complaints of headaches one to three times per month, usually just prior to or during menses.  R. 558.  Dr. Brown further noted that Zomig remains an effective treatment, as does even Excedrin at times.  *Id*.

The ALJ's hypothetical question acknowledged Plaintiff's complaints of migraine headaches and anxiety, and stated that if she experienced one of those, she would have to rest for a period of at least thirty minutes in a calmed environment, lying down.  R. 670.  The ALJ's hypothetical question assumed that Plaintiff "would not experience significant amounts of either syncope or dizziness or lightheadedness or migraines."  R. 670.

It is the ALJ's responsibility to frame the hypothetical to the VE.  In formulating the hypothetical question to be presented to the VE, the ALJ need not include claimed limitations that he does not accept as true.  *See, Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir. 1985); *see also, Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990); *Copeland v. Bowen*, 861 F.2d 536, 540-41 (9th Cir. 1988).  The ALJ may restrict his questions to those limitations he has found based upon substantial

evidence in the record.  *See, Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993).  In short, the ALJ

need not include a claimed impairment that is found not to be credible or is not supported by

substantial evidence.  *See, Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).

The ALJ complied with the terms of the remand order.  The ALJ considered the entire record,

including all evidence of Plaintiff's subjective complaints.  R. 566.  Substantial evidence supports the

ALJ's assessment of Plaintiff's RFC and his hypothetical question to the VE.  Plaintiff failed to prove

that she could not perform the jobs cited by the VE and the ALJ.  *See Doughty v. Apfel*, 245 F.3d

1274, 1278 n.2 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  The VE's

testimony provided substantial evidence to support the ALJ's conclusion that Plaintiff could perform

other work and was not disabled within the meaning of the Social Security Act.

**VI.   CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

is directed to enter a separate judgment pursuant to Fed. R. Civ. P. 58 in favor of Defendant, the

Commissioner of Social Security, and to close the case.

**DONE** and **ORDERED** in Orlando, Florida on August 2, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV

-33-

Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia          30303-8920


Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL                33602

The Honorable Henry U. Snavely
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL              32817